**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| BONNIE ANDERSON, on behalf of herself and all persons similarly situated,<br><br>Plaintiff,<br>v.<br><br>FRONTLINE TECHNOLOGIES GROUP LLC d/b/a FRONTLINE EDUCATION,<br><br>Defendant. | Case No.: 2:26-cv-08348<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff Bonnie Anderson ("Plaintiff"), on behalf of herself and all others similarly situated, file this Class Action Complaint against Frontline Technologies Group LLC, which does business as Frontline Education ("Frontline" or "Defendant"). Allegations about Plaintiff are made on personal knowledge. All other allegations are made on information and belief, based on the investigation of counsel. Plaintiff alleges as follows:

## NATURE OF THE ACTION

1. Frontline sells human-resources, payroll, recruiting, and administrative software to public school districts and other K-12 institutions nationwide. Districts upload the personnel files of their teachers, staff, and substitutes to Frontline's platform, and Frontline keeps that data for them.

2. Frontline earns revenue by holding and processing this information. Having chosen to collect and retain it, Frontline accepted responsibility for keeping it secure.

3. Frontline did not live up to that responsibility. On or about August 14, 2026, Frontline learned that an outside actor had gotten into its systems by way of a weakness in third-

party software and had reached files holding the sensitive data of a very large number of people (the "Data Breach").

4. Frontline's own notice and public reporting show that the compromised data includes sensitive Personally Identifiable Information such as names, mailing and email addresses, Social Security numbers, dates of birth, driver's license numbers, passport numbers, other government-issued identification numbers, Medicaid identification numbers, and student identification numbers (together, "PII"[1] or "Private Information").

5. The intrusion could have been avoided. Frontline did not use reasonable safeguards, left a vulnerability in third-party software open to exploitation, never told the people whose data it held that its security fell short, and waited more than ten weeks to warn them.

6. Frontline's conduct has caused real and continuing injury to Plaintiff and Class members in every part of the country.

7. Plaintiff brings this suit to hold Frontline accountable for disregarding basic, legally required cybersecurity practices, a disregard that rises to the level of gross negligence.

8. Plaintiff and Class members are already worse off. Their Private Information is now in criminal hands, which exposes them to fraud and identity theft that is both imminent and lasting. Social Security numbers and birth dates cannot practically be changed, so that danger will follow them for life.

9. Plaintiff and Class members have also lost time, and in many cases money, monitoring accounts, freezing credit, and taking other protective steps. That work is ongoing.

---

[1] Personally identifiable information generally means information that can be used to distinguish or trace a person's identity, either by itself or combined with other personal or identifying information. 2 C.F.R. § 200.1. At a minimum, it covers any information that identifies a person on its face.

10. Plaintiff asks for compensatory damages and restitution for herself and the Class. Plaintiff also asks the Court to declare the parties' rights and to order Frontline to overhaul its security program, submit to recurring independent audits, fund long-term identity and credit monitoring, and provide any further relief the Court finds appropriate.

## PARTIES

11. Plaintiff Bonnie Anderson is an adult who resides in San Antonio, Texas and is a citizen of Texas. Plaintiff is a teacher at Miller's Point Elementary School in the Judson Independent School District, which used Frontline's platform to store and process employee records.

12. Defendant Frontline Technologies Group LLC, doing business as Frontline Education, is a limited liability company organized under the laws of Delaware. Its headquarters and principal place of business are at 550 E. Swedesford Road, Suite 360, Wayne, Pennsylvania 19087.

## JURISDICTION AND VENUE

13. This Court has subject-matter jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2). The proposed Class has more than 100 members, the total amount in controversy is above $5,000,000 not counting interest and costs, and at least one Class member, including Plaintiff, a citizen of Texas, is a citizen of a state different from Defendant.

14. For CAFA purposes, an unincorporated association such as Defendant is a citizen of the state where it has its principal place of business and of the state under whose laws it is organized. 28 U.S.C. § 1332(d)(10). Defendant is therefore a citizen of Pennsylvania and of Delaware.

15. The people whose data was exposed live in states across the country, so minimal diversity is met many times over. Fewer than one-third of Class members are citizens of Pennsylvania, so none of CAFA's exceptions in 28 U.S.C. § 1332(d)(3)–(4) applies.

16. The Court has general personal jurisdiction over Defendant because Defendant is headquartered in, and runs its business from, this District. Defendant also made the data-handling decisions at issue here from Pennsylvania.

17. Under 28 U.S.C. § 1391(b)(1), venue lies here because Defendant resides here within the meaning of § 1391(c)(2). Venue is also proper under § 1391(b)(2), because Defendant made, and failed to carry out, its data security decisions in substantial part in this District.

## FACTUAL ALLEGATIONS

### A. Frontline's Business and the Data It Holds

18. Frontline markets itself as a leading provider of school administration software "that empowers K-12 leaders to proactively oversee human resources, business operations, and student health and special education management."[2]

19. To use these products, school districts must give Frontline detailed personnel information about their workforce, including Social Security numbers, birth dates, home addresses, identification numbers, and benefits information.

20. Teachers and other school employees do not choose Frontline. Their employers do. Employees have no say over where their data goes and no means of checking how Frontline protects it.

---

[2] *Teaming Up With Frontline Education*, Frontline, https://www.frontlineeducation.com/insights/partner-with-frontline/ (last accessed Oct. 30, 2026).

21. Frontline understood that it was collecting a concentrated store of highly sensitive data on hundreds of thousands of public-school employees, and that this made its systems an appealing target.

**B. The Data Breach and Frontline's Delayed Notice**

22. On or about August 14, 2026, Frontline discovered that an unauthorized party had exploited a vulnerability in third-party software Frontline used and, through it, gained entry to part of Frontline's computer environment, specifically its Frontline Central employee-management platform and its School Health Management platform.

23. Frontline's later investigation determined that the intruder had reached, and copied, files containing the Private Information of a large number of individuals. Filings with state regulators already reflect at least 805,382 affected individuals in just four states, including 778,372 in Texas alone,[3] and Frontline serves more than 10,000 K-12 organizations nationwide.[4]

24. Frontline has stated that the unauthorized access began on August 14, 2026, and that the last day of unauthorized activity was August 15, 2026. Frontline has not disclosed what the exploited vulnerability was, whether a patch or mitigation for it was available before the attack, or why the Private Information was accessible in unencrypted form.

25. Even though it knew the data at issue included Social Security numbers, Frontline did not confirm that school employees' Private Information was involved until on or about October 2, 2026, roughly seven weeks after discovery, and affected school districts did not begin disclosing

---

[3] *Frontline Education Data Breach Affected More Than 800,000 People*, teiss (Oct. 29, 2026), https://www.teiss.co.uk/news/frontline-education-data-breach-affected-more-than-800000-people-18382.

[4] Stefanie Schappert, *Hackers breach school tech giant serving 50 million students nationwide*, Cybernews (Oct. 27, 2026), https://cybernews.com/news/hackers-breach-school-tech-giant-serving-50-million-students-nationwide/.

the Data Breach to their employees and families until early October.[5] Individual notice letters did not begin going out until on or about October 26, 2026.[6] Every week of delay gave criminals more time to use the stolen data while victims remained unaware. Plaintiff did not receive her notice until October 28, 2026, 75 days after Frontline identified the unauthorized access.

26. The intruder took the Private Information out of Frontline's network and has used, or will use, it for fraud, including by offering it for sale on dark-web marketplaces.

27. Frontline owed Plaintiff and Class members a legal obligation, arising from statute, common law, industry standards, and its own public commitments, to keep their Private Information confidential and protected from unauthorized access.

28. Frontline nonetheless underinvested in the protections that would have stopped or contained the intrusion, including timely patching of known vulnerabilities, encryption of sensitive data at rest, network segmentation, intrusion detection, and staff training.

29. The data taken in the Data Breach is especially valuable to criminals, both because of the sheer number of people affected and because it pairs names with Social Security numbers and dates of birth.

**C. Plaintiff's Experience**

30. Plaintiff received by email a notice of data breach from Frontline, dated October 28, 2026, stating that Frontline had "determined that [her] Social Security number [was] obtained" in the Data Breach. It offered her 24 months of credit monitoring through a single credit bureau, TransUnion.

---

[5] Schappert, *supra* note 4.

[6] *Frontline Education Notice of Data Breach*, Frontline (Oct. 26, 2026), https://www.frontlineeducation.com/news/frontline-education-notice-of-data-breach/.

31. On Thursday, October 29, 2026, the day after she received Frontline's notice, a cybercriminal attempted to log in to Plaintiff's Amazon account without her authorization. That attempted account takeover is the kind of misuse that follows when criminals obtain a person's identifying information, and it shows that Plaintiff's information is already being targeted.

32. Plaintiff takes care to guard her Private Information. Plaintiff does not knowingly share her Social Security number over unsecured channels and stores documents containing sensitive information securely.

33. Plaintiff's Private Information now sits with criminals as a result of the intrusion, and Plaintiff faces a substantial, ongoing risk of identity theft and fraud.

34. The intrusion has injured Plaintiff in several concrete ways:

a. the taking of Plaintiff's valuable Private Information and the loss of control over it;

b. a real and impending threat of fraud and identity theft now that criminals hold that information;

c. a reduction in the value of Plaintiff's Private Information, which was handed to Frontline on the understanding that it would be kept secure;

d. the lost value of Plaintiff's bargain, measured by the difference between the data security Plaintiff was entitled to and the deficient security Frontline actually provided;

e. lost time and out-of-pocket costs spent responding to the Data Breach; and

f. a continuing risk to Plaintiff's Private Information, which Frontline still holds and which remains exposed until Frontline adopts adequate safeguards.

**D. Frontline's Legal Duties and the Standard of Care**

35. The Federal Trade Commission Act ("FTC Act") outlaws unfair and deceptive business conduct that touches interstate commerce. 15 U.S.C. § 45. For years, the Federal Trade Commission ("FTC") has treated a company's failure to maintain reasonable security for sensitive consumer data as an unfair practice under Section 5, and the Third Circuit has upheld the FTC's authority to do so.[7]

36. State statutes and regulations also require businesses that hold personal information to adopt reasonable security measures and to give timely notice when that information is compromised. *See*, *e.g.*, 73 P.S. § 2301 *et seq.*; Tex. Bus. & Com. Code §§ 521.052(a), 521.053(b). Texas law, for example, requires a business to "implement and maintain reasonable procedures" to protect the sensitive personal information it maintains, including Social Security numbers, and to notify affected individuals "without unreasonable delay and in each case not later than the 60th day after the date on which the person determines that the breach occurred." *Id.* §§ 521.052(a), 521.053(b).

37. Frontline owed Plaintiff and the Class a duty to design, maintain, monitor, and test its systems so that the Private Information it held stayed secure.

38. Frontline owed Plaintiff and the Class a duty to adopt and enforce reasonable security policies and procedures, and to train its workforce and anyone else with access to its systems on how to protect Private Information.

39. Frontline owed Plaintiff and the Class a duty to identify and promptly remediate vulnerabilities in the software running in its environment, including third-party software; to

[7] *See FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

encrypt and segment the Private Information it stored; to retain that information no longer than necessary; and to act quickly on security alerts and published vulnerability warnings.

40. Frontline owed Plaintiff and the Class a duty to disclose that its security practices were inadequate, if they were, because anyone deciding whether to entrust data to Frontline would consider that fact material.

41. Frontline owed Plaintiff and the Class a duty to give them prompt and accurate notice of any breach affecting their Private Information.

42. Frontline owed Plaintiff and the Class a duty of reasonable care because they were the foreseeable victims of any failure in Frontline's data security.

**E. Frontline Knew It Was a Target**

43. Large-scale data breaches have been front-page news for well over a decade, and the risk they pose is common knowledge in the technology industry.

44. The education-technology sector in particular has seen a wave of major intrusions in the past two years, including the December 2024 PowerSchool breach, which exposed data on tens of millions of students and educators, and the 2026 breach of Instructure's Canvas learning platform by the criminal extortion group ShinyHunters.[8] In 2025, the Identity Theft Resource Center recorded more than 3,300 data compromises in the United States.[9]

---

[8] *See* Carly Page, *PowerSchool Begins Notifying Students and Teachers After Massive Data Breach*, TechCrunch (Jan. 28, 2025), https://techcrunch.com/2025/01/28/powerschool-begins-notifying-students-and-teachers-after-massive-data-breach/; Daniel Xu, *Criminal Hacker Group ShinyHunters Breaches Canvas*, Stanford Daily (May 7, 2026), https://stanforddaily.com/2026/05/07/criminal-hacker-group-shinyhunters-breaches-canvas/.

[9] *Identity Theft Resource Center 2025 Annual Data Breach Report: Record Number of Data Compromises in 2025; 79 Percent Jump Over Five Years*, ITRC (Jan. 29, 2026), https://www.idtheftcenter.org/post/2025-annual-data-breach-report-record-number-compromises/.

45. Given those events, Frontline knew, or at minimum should have known, that its systems were likely to be attacked and that the Private Information stored on them was at risk.

46. Frontline also knew that encrypting sensitive data and promptly patching known software vulnerabilities are basic measures for limiting the harm from an intrusion. Frontline did not encrypt the compromised data or patch the exploited vulnerability in time.

**F. Criminals Use Stolen Private Information to Commit Fraud**

47. The Private Information taken in the Data Breach is worth a great deal to criminals, who will use it to exploit Plaintiff and the Class for profit.

48. Identity theft costs Americans billions of dollars every year.[10] With a name, Social Security number, birth date, and address, a criminal can open bank and credit accounts, take out loans, file false tax returns, claim government benefits, obtain medical care, make counterfeit identification documents, and give a victim's identity to police during an arrest.

49. Stolen Private Information keeps its value for a long time. The U.S. Government Accountability Office has found that criminals may hold stolen data for a year or longer before using it, and that once data is sold or posted online, fraudulent use can continue for years.[11]

50. This data is also more harmful than stolen payment-card numbers. A compromised card can be cancelled and reissued in days. A Social Security number and date of birth cannot be

[10]Christina Ianzito, *Identity Fraud and Scams Cost Americans $47 Billion in 2024*, AARP (Mar. 25, 2025), https://www.aarp.org/money/scams-fraud/javelin-identity-theft-report-2024/.

[11]GAO-07-737, *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown,* U.S. Gov't Accountability Office (June 4, 2007), https://www.gao.gov/products/gao-07-737.

cancelled and are very difficult to change.[12] For that reason, identity data of this kind has been reported to sell on criminal markets for as much as ten times the price of stolen card data.[13]

51. The Data Breach was a deliberate, financially motivated attack aimed at a store of employee identity data, and the stolen information is exactly what is needed to commit the crimes described above.

52. The risk is both concrete and substantial. The FTC has warned that thieves who obtain personal information will use it.[14]

53. Victims of identity theft often spend many hours and significant sums of money undoing the damage to their credit and finances.[15] Plaintiff and Class members now face that burden.

54. The intrusion has directly harmed Plaintiff and the Class and leaves them exposed to a lasting, elevated threat of fraud and identity theft. They must now spend time and money to protect themselves for years to come. That includes buying credit and identity monitoring, placing and maintaining credit freezes and fraud alerts, contacting banks and insurers, changing or closing accounts, and closely watching their credit reports, bank statements, and insurance records.

---

[12] *See* Soc. Sec. Admin., *Identity Theft and Your Social Security Number*, Pub. No. 05-10064 (Mar. 2026), https://www.ssa.gov/pubs/EN-05-10064.pdf (explaining that even a new Social Security number "won't guarantee you a fresh start").

[13] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, Network World (Feb. 6, 2015), https://www.networkworld.com/article/935334/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

[14] *Advice for Consumers*, FTC, https://www.ftc.gov/news-events/topics/identity-theft/advice-consumers (last accessed Oct. 30, 2026).

[15] *Identity Theft: A Recovery Plan*, Fed. Trade Comm'n, https://www.identitytheft.gov/ (last accessed Oct. 30, 2026).

55. The compensable injuries Plaintiff and the Class have sustained, and are still sustaining, include:

a. the theft of, damage to, and loss of control over their Private Information, which is a form of property;

b. the unauthorized disclosure of their Private Information;

c. a real and impending threat of fraud and identity theft now that their Private Information is in criminal hands;

d. an increased risk of targeted phishing, scam calls, and other social-engineering fraud using their Private Information;

e. harm caused by Frontline's late and incomplete notice of the Data Breach;

f. invasion and loss of their privacy;

g. out-of-pocket costs, and the value of time reasonably spent, to detect, prevent, and remedy the effects of the Data Breach;

h. lost value of their Private Information, for which a well-established market exists;

i. being cut off from their credit, accounts, and money;

j. harm to their credit standing caused by misuse of their data; and

k. higher borrowing, insurance, and deposit costs, and other expenses that follow from a lower credit score.

56. Plaintiff and Class members also have a continuing interest in making sure that the Private Information Frontline still holds is protected from future breaches by security measures that meet industry standards and legal requirements. Frontline has shown that it cannot be relied on to provide that protection without court oversight.

57. Plaintiff and Class members are working to limit the harm Frontline has caused, but more harm is certain to follow. Because criminals now have their Private Information, Plaintiff and the Class will need identity protection permanently. Frontline's offer of two years of credit monitoring through a single credit bureau is inadequate. It covers only one of the three national credit bureaus, and Social Security numbers, birth dates, and government identification numbers can be misused for many years after the two-year period ends.

**G. Frontline Could Have Prevented the Data Breach**

58. Data breaches are preventable. This instance is no different. Security professionals widely recognize that most breaches result from weak security practices, such as failing to patch known vulnerabilities, failing to encrypt data, or failing to enforce access controls, rather than from attacks that cannot be stopped.

59. The FTC has issued detailed guidance telling businesses how to protect personal information, and it has advised that data security be built into business decisions from the start.[16]

60. Under that guidance, businesses should know what personal information they hold; keep only what they need; lock down what they keep, including by encrypting it on their networks; dispose of data they no longer need; and have a plan for responding to security incidents. The FTC also advises businesses to understand their network's weak points, use intrusion detection tools, watch for unusual traffic and large outbound data transfers, and fix known flaws promptly.[17]

61. The FTC further advises businesses to limit employee access to sensitive data, require strong passwords and multi-factor authentication, use well-tested security methods, keep

[16] *Protecting Personal Information: A Guide for Business*, Fed. Trade Comm'n, https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last accessed Oct. 30, 2026).

[17] *Id.*

software current, and confirm that outside vendors and software providers maintain reasonable security.[18]

62. The FTC has brought many enforcement actions against companies that failed to take reasonable steps to protect personal data, treating those failures as unfair practices under Section 5 of the FTC Act. The resulting orders spell out the measures businesses are expected to take.

63. Frontline did not adopt basic security practices like those the FTC recommends.

64. By failing to use reasonable and appropriate measures to prevent unauthorized access to the Private Information it held, Frontline engaged in conduct that Section 5 of the FTC Act forbids as unfair.

65. Frontline also fell short of widely accepted security frameworks, including the National Institute of Standards and Technology Cybersecurity Framework 2.0 as well as the CIS Critical Security Controls published by the Center for Internet Security. Those frameworks call for asset and vulnerability management, timely patching, identity and access management, data protection, continuous monitoring, and incident response.[19]

66. Plaintiff and Class members, through their employers, relied on Frontline to hold their Private Information securely and to protect it from unauthorized disclosure.

67. The Data Breach happened because of a series of choices by Frontline, beginning with its decision not to spend what was needed on reasonable and adequate security procedures.

---

[18] *Start with Security: A Guide for Business*, Fed. Trade Comm'n (Aug. 2023), https://www.ftc.gov/business-guidance/resources/start-security-guide-business.

[19] *The NIST Cybersecurity Framework (CSF) 2.0*, Nat'l Inst. of Standards & Tech. (Feb. 26, 2024), https://doi.org/10.6028/NIST.CSWP.29; *CIS Critical Security Controls Version 8.1*, Ctr. for Internet Sec. (June 25, 2024), https://www.cisecurity.org/insights/white-papers/cis-critical-security-controls-v8-1.

68. Frontline knew at all times that it was obligated to protect the Private Information it held, and it knew how serious the consequences of failing to do so would be.

69. Frontline handled the Private Information recklessly. Frontline stored that data unencrypted on systems that were open to attack through unpatched software.

70. Frontline knew, or reasonably should have known, how important it was to safeguard the Private Information and what would happen if that data were stolen, including the substantial costs that Plaintiff and Class members would bear.

71. The kind of attack that occurred here, and the resulting exposure of Private Information, were known risks. Frontline was on notice that failing to guard against them left the Private Information dangerously exposed.

72. In short, Frontline ignored the interests of the people whose data it held. It chose, whether deliberately, recklessly, or carelessly, not to secure its systems and the outside software running on them. It kept quiet about the weakness of its security protocols and training. It skipped ordinary, readily available precautions that would have stopped the intrusion. It sat on the news of the Data Breach and its scope for an unreasonable time. And it gave Plaintiff and the Class a late and incomplete warning.

## CLASS ACTION ALLEGATIONS

73. Plaintiff brings this class action individually and on behalf of the following nationwide class (the "Nationwide Class"):

> All persons in the United States who had Private Information accessed, acquired, or otherwise compromised in the Data Breach.

74. Plaintiff also brings this action, in the alternative, on behalf of the following Texas class (the "Texas Class"):

> *Texas Class*: All persons residing in Texas who had Private Information accessed, acquired, or otherwise compromised in the Data Breach.

75. Plaintiff seeks to represent both the Nationwide Class and the Texas Class. Unless otherwise stated, the Nationwide Class and the Texas Class are referred to together as the "Class," and their members as "Class members."

76. The Class does not include Defendant; its officers, directors, members, and affiliates; any judge presiding over this case, along with that judge's staff and immediate family; or anyone who opts out in a timely and valid manner.

77. Plaintiff may revise the Class definition or propose subclasses later, including in a motion for class certification.

78. The Class meets the prerequisites of Federal Rule of Civil Procedure 23(a) and the standards of Rule 23(b)(2) and (b)(3). Certification of particular issues under Rule 23(c)(4) is also appropriate.

79. ***Numerosity***. The Class numbers more than 800,000 people, including more than 778,000 Texas residents, so joining every member is impracticable. Class members can be identified from Defendant's records and the notice lists it compiled after the Data Breach.

80. ***Typicality***. Plaintiff's claims mirror those of every other Class member. All of them, Plaintiff included, had data exposed in one incident caused by one course of conduct, and all rely on the same legal theories.

81. ***Adequacy***. Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has no interests that conflict with those of other Class members, has hired counsel experienced in data breach class actions, and, together with counsel, intends to pursue this case vigorously.

82. ***Superiority***. A class action is the best available way to resolve this dispute fairly and efficiently. Each Class member's damages are small compared with the cost of suing a well-funded defendant over complex technical issues, so few could realistically sue on their own. Even if they could, thousands of separate suits would burden the courts, raise the risk of inconsistent rulings, and add delay and expense for everyone. A single class proceeding avoids those problems and allows the claims to be decided once, under one court's supervision.

83. ***Commonality and Predominance***. This case turns on numerous shared legal and factual issues, which outweigh any issue specific to an individual Class member. Those shared issues include:

a. whether the misconduct described in this Complaint occurred;

b. whether Defendant's safeguards for the Class's Private Information were reasonable;

c. whether Defendant's systems and security practices satisfied the FTC Act, applicable state law, and Defendant's other obligations;

d. whether Defendant had a duty to protect the Class's Private Information and, if so, whether Defendant fell short of it;

e. whether Defendant was aware, or should have been aware, that its systems and the third-party software it ran were open to attack;

f. whether Defendant's acts and omissions caused the Data Breach;

g. whether Defendant violated implied promises to handle the Class's Private Information with reasonable care;

h. whether Defendant investigated the intrusion diligently and warned affected people without unreasonable delay, and whether any delay caused harm;

i. whether Defendant's violations are ongoing;

j. whether Defendant's negligence proximately injured Class members;

k. what damages, restitution, or other remedies Class members may recover;

l. whether an injunction is warranted and, if so, what terms are needed to address the ongoing threat to Class members and the public;

m. whether Defendant's conduct amounts to gross negligence; and

n. whether punitive damages are available.

## **CAUSES OF ACTION**

## **COUNT I**

### **NEGLIGENCE**
**(Asserted by Plaintiff on behalf of the Nationwide Class or, alternatively, the Texas Class)**

84. Plaintiff incorporates by reference and re-alleges paragraphs 1 through 83 above as though fully set forth herein. Plaintiff brings this Count on behalf of the Nationwide Class or, alternatively, on behalf of the Texas Class.

85. Frontline sought out, accepted, and retained Class members' Private Information because doing so was part of how it made money.

86. Once Frontline took custody of that data, it became obligated to Plaintiff and every Class member to guard it with reasonable care and secure methods.

87. Frontline understood how sensitive the data was, how badly Class members could be hurt if it leaked, and why strong security mattered.

88. Class members were the people most foreseeably hurt by any security lapse. They could not protect data sitting on Frontline's servers and had to rely on Frontline to do it. That dependence created a special relationship between Frontline and the Class.

89. Frontline knew that criminals regularly attack companies that hold large stores of personal data in order to steal it.

90. Under the common law, Frontline was required to act reasonably when it gathered, kept, used, and managed Class members' Private Information, so as not to expose them to foreseeable harm. That obligation required reasonable security and a timely warning after any intrusion, so that victims could act to limit their losses.

91. That obligation included guarding against foreseeable crimes by third parties. Such a duty arises when a defendant's own conduct creates or heightens the risk of third-party misconduct, or when the parties share a special relationship. Restatement (Second) of Torts § 302B. *See Dittman v. UPMC*, 196 A.3d 1036, 1047 (Pa. 2018). A growing body of case law and legislation likewise recognizes a specific duty to keep personal information reasonably secure.

92. Frontline had to take ordinary, common-sense precautions against cyberattack. Its specific obligations to the Class included:

a. building, operating, monitoring, patching, and testing its networks, software, and security policies with reasonable care so that Private Information stayed out of unauthorized hands;

b. applying reasonable and adequate security tools and procedures to the data it held;

c. keeping systems in place that would promptly flag any intrusion into its networks, servers, or software; and

d. warning Class members promptly whenever an intrusion did or might have reached their data.

93. Only Frontline could make sure its own systems and procedures were good enough to protect the data entrusted to it.

94. Frontline did not use reasonable care to protect Class members' Private Information. Its failures include that it:

a. did not handle, retain, or delete the Private Information with reasonable care;

b. did not apply reasonable and adequate security tools and procedures to that data;

c. did not track and promptly patch known flaws in its software;

d. did not encrypt the data or segment its network so that one point of entry could not expose everything;

e. did not adequately audit, test, or train its workforce on securing, transmitting, and storing Private Information;

f. kept Private Information longer than its business purpose required;

g. did not consistently enforce its own security policies;

h. did not maintain systems capable of quickly detecting an intrusion; and

i. did not warn Class members of the Data Breach in a timely way.

95. Given the risks Frontline knew about, its disregard of these obligations was negligent.

96. Frontline's negligent conduct foreseeably and proximately caused the injuries described above, and Class members remain at imminent risk of more.

97. By the acts and omissions described in this Complaint, including allowing the Private Information to be stolen and misused, Frontline failed to use reasonable care while the data was in its possession and under its control.

98. Frontline's slow and unclear notice also denied Class members the chance to act quickly to protect themselves and limit their losses.

99. Class members have had to devote time, effort, and money to dealing with the Data Breach. They must address fraudulent activity, watch their bank accounts, and review credit reports and statements from banks and insurers.

100. As a direct and proximate result of Defendant's negligence and breach of its duties, Plaintiff and Class members face a substantial and imminent risk of fraud and identity theft. Their Private Information was taken in a targeted cyberattack by criminals who obtained it to misuse it, and it remains in the possession of those criminals and other unauthorized third parties. Plaintiff and Class members have suffered, and will continue to suffer, damages including: a substantially increased and ongoing risk of identity theft and fraud; the compromise, publication, and theft of their Private Information; lost time and out-of-pocket costs spent preventing, detecting, and remediating unauthorized use of their Private Information; future time, effort, and expense required to monitor for, prevent, and repair the harm caused by the Data Breach; the continued risk to their Private Information, which remains in Defendant's possession and subject to further breaches unless Defendant implements adequate safeguards; and the lost value of their Private Information.

101. Plaintiff and the Class have suffered injury and are entitled to actual and punitive damages in amounts to be proven at trial.

## COUNT II

**NEGLIGENCE *PER SE***
**(Asserted by Plaintiff on behalf of the Nationwide Class or, alternatively, the Texas Class)**

102. Plaintiff incorporates by reference and re-alleges paragraphs 1 through 83 above as though fully set forth herein. Plaintiff brings this Count on behalf of the Nationwide Class or, alternatively, on behalf of the Texas Class.

103. Section 5 of the FTC Act, 15 U.S.C. § 45(a)(1), prohibits "unfair . . . practices in or affecting commerce," which the FTC has interpreted and enforced to include failing to use reasonable measures to protect consumers' personal information. *See FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015). FTC publications and enforcement orders further define Defendant's duty. Defendant violated Section 5 by failing to use reasonable measures to protect Plaintiff's and Class members' Private Information.

104. Frontline violated Section 5 of the FTC Act. The injuries that followed from its failure to meet its duties, such as invasion of privacy, wasted time, out-of-pocket costs, and a heightened risk of identity theft, are exactly the injuries those laws aim to prevent. These violations directly and proximately injured Class members. Plaintiffs may therefore rely on the presumptions available for negligence *per se*.

105. Section 5 of the FTC Act, 15 U.S.C. § 45(a), obligated Frontline to maintain reasonable systems and data security for the Private Information it held.

106. The FTC reads Section 5's ban on unfair practices to reach a company's failure to reasonably secure personal data, and it enforces the statute that way. The FTC guidance and enforcement orders described above help define what Frontline was required to do.

107. Frontline gathered and kept Class members' Private Information in the course of a business that affects interstate commerce.

108. Frontline violated Section 5 by not reasonably securing that data and by ignoring applicable industry standards, as described in this Complaint.

109. Frontline also violated Section 5 by failing to maintain reasonable systems and security practices.

110. Class members are among the people the FTC Act is meant to protect.

111. The FTC Act was meant to prevent the very kind of injury the Data Breach caused.

112. Frontline breached its statutory obligations by failing to keep reasonable systems and security practices in place for the Class's Private Information.

113. Frontline further breached those obligations by taking far longer than reasonable to tell the Class about the Data Breach.

114. Plaintiff and the Class have suffered injury and are entitled to actual and punitive damages in amounts to be proven at trial.

## COUNT III

**BREACH OF IMPLIED CONTRACT**
**(Asserted by Plaintiff on behalf of the Nationwide Class or, alternatively, the Texas Class)**

115. Plaintiff incorporates by reference and re-alleges paragraphs 1 through 83 above as though fully set forth herein. Plaintiff brings this Count on behalf of the Nationwide Class or, alternatively, on behalf of the Texas Class.

116. To get and keep their jobs, Class members had to supply their Private Information, which their employers then passed to Frontline as part of Frontline's ordinary business.

117. When Class members provided their Private Information, directly or through their employers, for use on Frontline's platform, they and Frontline formed implied contracts. Under those contracts, Frontline agreed to honor its legal obligations to safeguard the data and to tell the Class quickly if it were ever compromised.

118. Frontline's public statements, its legal obligations, and its acceptance of the data together created an implied promise to secure it using reasonable, industry-standard measures. In its Privacy Policy, for example, Frontline represents that it "maintains strict administrative, technical and physical procedures," that it "will conduct periodic risk assessments and remediate any identified security vulnerabilities in a timely manner," and that it has "a written incident response plan."[20]

119. Class members would not have allowed their data to be sent to Frontline without an understanding that Frontline would keep it secure.

120. Class members did their part by supplying accurate Private Information. Their employers also paid Frontline for its services, in part for Class members' benefit.

121. Frontline broke those implied promises in two ways. It failed to keep the data secure, and it failed to give Class members a prompt and accurate warning. Frontline let weeks pass before alerting Class members to the serious identity theft risk they faced. And when it did, its notice left out information Class members needed to protect themselves, including what the exploited vulnerability was and when Frontline determined that their information had been obtained.

122. Frontline's breach directly and proximately caused Class members' losses. Those losses include consequential damages that Frontline could foresee when it took the data. Plaintiff and Class members are therefore entitled to actual damages in amounts to be proven at trial.

[20] *Privacy Policy*, Frontline, https://www.frontlineeducation.com/pages/privacy-policy/ (last accessed Oct. 30, 2026).

## COUNT IV

### UNJUST ENRICHMENT
**(Asserted by Plaintiff on behalf of the Nationwide Class or, alternatively, the Texas Class)**

123. Plaintiff incorporates by reference and re-alleges paragraphs 1 through 83 above as though fully set forth herein. Plaintiff brings this Count on behalf of the Nationwide Class or, alternatively, on behalf of the Texas Class.

124. This count is pleaded in the alternative to Plaintiff's other claims and to any adequate remedy at law.

125. Frontline took in and kept the Class's Private Information because doing so made it money, and it knew that it was benefiting financially.

126. Frontline enriched itself unfairly by pocketing money it should have spent on reasonable privacy and security protections for that data.

127. Companies that hold this kind of data routinely invest in the security, training, and controls that would have prevented this intrusion. Frontline instead made a deliberate choice to boost its own margins and leave Class members to bear the risk.

128. Frontline did not put in place, or did not properly carry out, the security practices and programs needed to protect the data, including the industry-standard measures described in this Complaint.

129. Because Frontline put profit ahead of security, Class members have been harmed and are still being harmed. Their damages include: (i) the security spending Frontline avoided; (ii) the time and money they have spent limiting the damage; (iii) the lost value of their Private Information; (iv) the invasion of their privacy; (v) losses from identity theft; and (vi) an elevated risk of identity theft in the future.

130. Frontline acted opportunistically and unethically. It profited from conduct it knew carried a serious and likely danger of imminent harm to the Class, in direct conflict with the Class's interests. Equity does not permit Frontline to keep the benefits of that conduct.

131. Class members are therefore entitled to restitution and disgorgement of Frontline's wrongfully obtained gains, to be placed in a common fund and distributed among them.

## COUNT V

### DECLARATORY JUDGMENT
### (28 U.S.C. §§ 2201–2202)
### (Asserted by Plaintiff on behalf of the Nationwide Class or, alternatively, the Texas Class)

132. Plaintiff incorporates by reference and re-alleges paragraphs 1 through 83 above as though fully set forth herein. Plaintiff brings this Count on behalf of the Nationwide Class or, alternatively, on behalf of the Texas Class.

133. Under the Declaratory Judgment Act, in "a case of actual controversy within its jurisdiction," this Court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The Court may also grant "[f]urther necessary or proper relief based on a declaratory judgment." *Id.* § 2202.

134. Frontline still holds the Private Information of Plaintiff and Class members. It will keep collecting and storing that information for as long as their current and former employers and schools use Frontline's platform, and Plaintiff and Class members have no ability to retrieve it or control how Frontline protects it.

135. An actual, substantial, and continuing controversy exists between Plaintiff and the Class, on the one hand, and Frontline, on the other, over Frontline's present and ongoing duties to reasonably safeguard the Private Information it holds and to give prompt and accurate notice of

any future compromise of that information. Plaintiffs allege that Frontline's data security measures were inadequate and remain inadequate. Frontline, for its part, has publicly represented that it has strengthened its security and monitoring controls since the Data Breach.

136. Frontline's duties arise from the common law, Section 5 of the FTC Act, and Frontline's implied contractual commitments, as alleged above. Frontline breached those duties by, among other things, failing to timely remediate the third-party software vulnerability exploited in the Data Breach, storing Private Information without adequate encryption or segmentation, retaining Private Information longer than necessary, and delaying notice of the Data Breach.

137. Plaintiff and Class members continue to suffer injury from the Data Breach, and they face a real and immediate risk that Frontline's inadequate security will expose their Private Information again.

138. Plaintiff therefore seeks a declaration that:

a. Frontline owes Plaintiff and Class members a legal duty to reasonably secure their Private Information and to give them timely and accurate notice of any breach of that information;

b. Frontline breached, and continues to breach, that duty by failing to use reasonable measures to secure the Private Information in its possession; and

c. Frontline's ongoing breaches of that duty continue to cause Plaintiff and Class members harm.

139. Under 28 U.S.C. § 2202, the Court should also enter corresponding prospective injunctive relief requiring Frontline to use security practices that meet legal requirements and industry standards, including the measures set out in paragraph (d) of the Prayer for Relief.

140. Without that relief, Plaintiff and Class members will suffer irreparable injury and will lack an adequate remedy at law if Frontline suffers another breach. The risk of another breach is real, immediate, and substantial. Many of the injuries that would follow, including the loss of privacy and the lasting risk of identity theft, cannot be readily quantified or fully compensated by money damages, and Plaintiff and Class members would be forced to bring further lawsuits to remedy the same conduct.

141. The balance of hardships favors Plaintiff and Class members. If another breach occurs, they will again face a substantial risk of fraud and identity theft. By contrast, the cost to Frontline of adopting reasonable security measures is modest, and Frontline is already legally obligated to adopt them.

142. The requested relief serves the public interest. It will reduce the risk of another breach at Frontline and protect not only Plaintiff and Class members but also the many other public-school employees and students whose Private Information Frontline holds.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the Class, asks the Court to enter judgment against Defendant and to award the following relief:

a. Certification of this case as a class action under Rule 23, defining the Nationwide Class and the Texas Class as set out above, appointing Plaintiff as Class representative, and appointing Plaintiff's counsel as Class counsel;

b. Judgment for Plaintiff and the Class awarding compensatory damages, punitive damages, restitution, and disgorgement in amounts to be determined at trial;

c. A declaration of the parties' rights and obligations as set out in Count V, and corresponding injunctive relief under 28 U.S.C. § 2202;

d. Injunctive and other equitable relief needed to protect the Class and the public, including an order requiring Defendant to:

   i. retain qualified outside security auditors and penetration testers, along with internal security staff, to test and audit Defendant's systems on a regular schedule, including through simulated attacks, and to promptly fix any weaknesses they find;

   ii. retain outside auditors and internal staff to carry out continuous, automated security monitoring;

   iii. audit, test, and train its security staff on any new or revised procedures;

   iv. segment its networks and data, using firewalls and access controls, so that an intrusion into one part of its systems cannot reach the rest;

   v. maintain an inventory of all third-party software in its environment and patch known vulnerabilities within defined, industry-standard timeframes;

   vi. encrypt Private Information at rest and in transit;

   vii. securely delete Private Information it no longer needs to provide its services;

   viii. regularly scan its databases and systems for vulnerabilities and security issues;

ix. provide ongoing training to its security staff on how to detect, contain, and respond to a breach; and

x. teach its past, present, and future workforce and contractors about the dangers that follow when sensitive data is compromised and what they must do to prevent it;

e. An order requiring Defendant to provide Plaintiff and Class members with identity theft protection and credit monitoring services, paid for by Defendant, for a period the Court finds adequate;

f. Defendant's payment of all expenses of giving Class members notice of the judgment and of running the claims process;

g. Interest before and after judgment, together with reasonable attorneys' fees, costs, and expenses to the extent the law allows; and

h. Whatever additional relief the Court deems fair and appropriate.

## JURY DEMAND

Under Federal Rule of Civil Procedure 38, Plaintiff requests trial by jury of every claim and issue so triable.

DATED: November 2, 2026

*<u>/s/ Mark B. DeSanto</u>*
Mark B. DeSanto (Bar No. 320310)
**BERGER MONTAGUE P.C.**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
mdesanto@bergermontague.com

E. Michelle Drake*
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
Telephone: (612) 594-5999
Facsimile: (612) 584-4470
emdrake@bergermontague.com

Julia Veeser*
110 N. Wacker Drive, Suite 2500
Chicago, IL 60606
Telephone: (773) 666-4316
jveeser@bergermontague.com

* Pro hac vice forthcoming

*Attorneys for Plaintiff and the Proposed Classes*